IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| STREAMLINE BUSINESS GROUP, LLC | : |
| Plaintiff, | : CIVIL ACTION |
| v. | : |
| VIDIBLE, INC., *et al.* | : NO.: 2:14-cv-013433-MMB |
| Defendants. | : *Jury Trial Demanded* |

## FIRST AMENDED COMPLAINT

Plaintiff, Streamline Business Group, LLC d/b/a "Streamline Business Services, LLC" ("Plaintiff" and/or "SBG"), by and through its undersigned counsel, hereby brings this First Amended Complaint against the above-named defendants, and in support thereof, says:

### Introduction

1.  Vidible, Inc. ("Vidible"), is a technology startup in the business of connecting buyers and sellers of video content. It created a live exchange marketplace for videos, conceptually similar to eBay. The successful launch of the exchange was wrought, in part, from the efforts of SBG – who was instructed to market and sell a video player to lure customers to the exchange for a 50% share in the resulting gross revenue stream over a five year term.

2.  For half a year, the parties performed as agreed until SBG's share in the fees grew to a lucrative $100,000 per month. At that point, and under admitted pressure from its Series A investors, Vidible tried to negotiate a 80% reduction of SBG's contractual share in the video player revenue stream. When that, *not surprisingly*, failed, Vidible simply stopped making required payments, materially breaching the contract, resulting in millions of dollars of loss of profits, loss of business, loss of future profits, and costs to SBG.

4833-4573-7754.1

## The Parties

3.  Plaintiff, SBG, is a Pennsylvania limited liability company having a principal place of business at 2791 Highland Avenue, Broomall, PA 19006. Its sole members are Pennsylvania and Nevada residents, respectively. SBG is the real party in interest for this controversy, conducting business as "Streamline Business Services, LLC."

4.  Defendant, Vidible, is a Delaware corporation having a principal place of business at 17345 SE 54th Place, Bellevue, WA 98006.

5.  Defendant, Timothy Mahlman ("Mahlman") is an adult individual with an address at 600 W. Santa Inez Avenue, Hillsborough, CA 94010.

6.  Defendant, Michael Hyman ("Hyman") is an adult individual with an address at 17345 SE 54th Place, Bellevue, WA 98006.

7.  Defendant, Greycroft Partners, L.P. ("Greycroft"), is a Delaware limited partnership a principal place of business at 598 Madison Avenue, New York, NY 10022. According to its website (http://greycroft.com/about/subpage/ (last visited on April 23, 2014):

> [Greycroft's] mandate is to invest in products and services that are delivered over the Internet or wireless networks, which means that [it] consider[s] a wide variety of good ideas that are digital media-related . . . [Greycroft] ha[s] the ability to pursue businesses across the globe, although [it] spend[s] most of [its] time in New York and Los Angeles.

8.  Defendant, IDG Ventures USA III, L.P. ("IDG"), is a Delaware limited partnership a principal place of business at One Letterman Drive, Bldg. D, Ste. P100, San Francisco, CA 94129. According to its website (http://www.idgvusa.com/#about (last visited on April 23, 2014):

> IDG informs more people about information technology than any other company in the world. IDG is the leading multibillion dollar provider of IT media, research, conferences and events. IDG publishes more than 300 newspapers and magazines in 85 countries, led by the Computerworld, InfoWorld, Macworld, Network

World, and CIO global product lines. Through IDG.net, IDG offers online users more than 330 web sites in 70 countries. IDG also produces hundreds of computer-related conferences and trade shows in 35 countries, and its research arm, International Data Corporation (IDC), provides computer industry research and analysis through 51 offices in 43 countries worldwide.

### Jurisdiction and Venue

9. This Court has subject matter jurisdiction of this lawsuit pursuant to 28 U.S.C.A. §1332 insofar as the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States.

10. Venue in this District is proper under 28 U.S.C.A. §1391(b) in that the events giving rise to this claim occurred or the property that is the subject of the action is situated within the boundaries of this District.

### The Facts

11. Today, most advertisers use generic videos from the site they are advertising to roll after their advertising message. While there are owners of video content, who are looking for more distribution, and publishers, who are looking for appropriate content for their site, the market lacked an optimal medium for these parties to transact.

12. Vidible filled this void. It created an exchange marketplace where distributors and publishers could buy and sell videos from a large database to match their advertising message and reach a more targeted audience.

13. In early 2012, Vidible was in its infancy. Having raised $0 in investor financing, its limited resources were devoted to the technical build out of the envisioned video exchange.

14. It was at this time that SBG and Vidible began earnest talks of a joint venture to get the company off the ground. Vidible owned a video player and suggested that SBG market and sell the video player to lure customers to the video exchange.

15. In the digital media business, when companies advertise using a video player they typically pay a price per video load and play, generating a revenue stream.

16. SBG and Vidible entered into an oral contract whereby SBG agreed to procure customer relationships for Vidible and its products and, as to each customer so procured, Vidible agreed to pay SBG for its services.

17. Although the video exchange was still being built at the time, and thus, no definitive terms were reached on the split of this potential revenue stream, the parties agreed to discuss that split at a later date when it was more defined on how that service would be priced and collected.

18. As to the video player revenue stream, the parties orally agreed to a 50/50 split of gross revenues generated by SBG for a five year term. Vidible agreed to pay SBG when payment was received from the customer but in no event later than 45 days after receipt of payment.

19. Vidible asked SBG to immediately go recruit customers and start selling the video service so they could start developing relationships with customers and begin to sell them on using the video exchange.

20. SBG did that and recruited two big customers, namely, Dramatic Health, Inc. ("DHI"), based in New York City, and Matomy Media Group ("Matomy"), based in Israel.

21. SBG worked both of these companies for a substantial amount of time. SBG did all of the negotiation for these deals. Vidible participated in some demonstrations or technical calls and approved the final pricing terms. SBG then sent those terms to these customers on SBG's company letterhead.

22. DHI signed an agreement with Vidible for the video exchange. Neither signed an agreement on the video player pricing with Vidible. Nonetheless, both became substantial customers of Vidible.

23. DHI and Matomy started testing the Vidible video player in the Spring 2013.

24. DHI began to use it in earnest by July 2013. The payment terms SBG negotiated on behalf of Vidible were net 60 days. As the first payments began to come in to Vidible, Vidible paid SBG its 50% share in the fees shortly thereafter as agreed.

25. The Matomy relationship took longer to develop but presented a bigger opportunity for Vidible. Matomy wanted some additional customizations and technical support that Vidible was happy to provide. The payment terms SBG negotiated on behalf of Vidible were net 30 days for Matomy. Vidible contacted SBG almost daily during the Fall 2013, urging SBG to push Matomy to place more business with Vidible.

26. Both DHI and Matomy monthly gross revenues had grown to about $200,000 in the aggregate by the end of 2013 in gross revenue, providing SBG with almost $100,000 per month in its share of the fees.

27. As an additional incentive to get these customers to place more video player volume, Vidible convinced Collective, a big digital media company, to purchase some advertising from both DHI and Matomy. Since these were SBG relationships, Vidible gave the advertising deals to SBG and SBG made the offers to these groups, passing on some of the advertising and keeping some as a mark-up.

28. During this period, Vidible was transparent and gave SBG access to all reporting and invoicing. Based on Vidble's invoices to DHI and Matomy, and Collective's advertising usage for DHI and Matomy, SBG generated invoices to Vidible and Collective based on the

50/50 split and advertising fee collection with mark-up, respectively, which consistently were paid over a period of five months.

29. Volume was building and the accounts were growing rapidly, as set forth below:

| SBG Invoice # | REFERENCE Vidible Invoice # | Service Type | Invoice Amount | Due Date | Date Paid |
|---|---|---|---|---|---|
| 388 | HT05313 | Player | $754.31 (1/2 of total CPM) | 7/1/2013 | 8/12/2013 |
| 389 | HT063013 | Player | $3,350.45 (1/2 of total CPM) | 8/1/2013 | 8/12/2013 |
| 390 | Collective-May-DHI | Advertising | $7,237.26 | 9/1/2013 | 9/13/2013 |
| 391 | Collective -June-DHI | Advertising | $59,016.91 | 10/1/2013 | 10/11/2013 |
| 392 | Collective -June-Matomy | Advertising | $209.96 | 10/1/2013 | |
| 393 | MA06313 | Player | $78.87 (1/2 of total CPM) | 8/1/2013 | |
| 401 | MA073113 | Player | $44.92 (1/2 of total CPM) | 9/1/2013 | 10/21/2013 |
| 402 | HT073113 | Player | $5,647.92 (1/2 of total CPM) | 9/1/2013 | 10/21/2013 |
| 411 | HT083113 | Player | $12,319.94 (1/2 of total CPM) | 11/1/2013 | 11/20/2013 |
| 412 | MA083113 | Player | $3,212.15 (1/2 of total CPM) | 10/1/2013 | 10/21/2013 |
| 431 | HT093013 | Player | $18,095.01 (1/2 of total CPM) | 12/1/2013 | |
| 432 | MA093013 | Player | $7,120.20 (1/2 of total CPM) | 11/1/2013 | 11/5/2013 |

| 469 | MA103113 | Player | $6,953.18 (1/2 of total CPM) | 12/1/2013 | 12/6/2013 |
| 470 | HT103113 | Player | $20,105.17 (1/2 of total CPM) | 1/1/2014 | |
| 493 | MA113013 | Player | $22,553.06 (1/2 of total CPM) | 1/1/2014 | |
| 494 | HT113013 | Player | $17,782.15 (1/2 of total CPM) | 2/1/2014 | |
| 498 | Collective- July Matomy | Advertising | $2,582.35 | 12/1/2013 | |
| 521 | HT20131231 | Player | $48,535.95 (1/2 of total CPM) | 3/1/2014 | |
| 522 | MA20131231 | Player | $44,261.97 (1/2 of total CPM) | 2/1/2014 | |

*See* true and correct copies of referenced SBG invoices and available Vidible invoices attached hereto as Exhibits A and B, collectively and respectively, and made a part hereof.

30.     Vidible was now close to raising a first round of capital and expected to close by January 1, 2014.

31.     As early as October 2013, SBG became aware that Greycroft and/or IDG (together, the "Investors") were interested in making an investment in Vidible. In fact, Greycroft, through Vidible, sought SBG's consent to contact its customer, DHI, as a reference of Vidible, which was granted. John Elton, Partner of Greycroft, emailed DHI's principal on October 3, 2013 to set up a teleconference, presumably to discuss its business relationship with Vidible that had been achieved through the direct efforts of SBG. Unbeknownst to SBG, however, this outside influence by the Investors signaled the end of the companies' lucrative partnership.

32. On January 3, 2014, A. James Battista ("Battista"), on behalf of SBG, and Mahlman, on behalf of Vidible, met in San Francisco for lunch. Vidible had just closed on its first round of $3.6 million in financing led by Greycroft and joined by IDG.

33. At the close of a positive and productive meeting, Mahlman mentioned in passing, and for the first time, that Vidible was expending a lot of effort supporting Matomy and asked whether SBG would we be open to adjusting its share of the revenue slightly to help them support their efforts to grow the account. Mahlman said that he would send an e-mail with a proposal.

34. Again, unbeknownst to SBG, the Investors now were providing active, hands-on assistance in all phases of Vidible's expansion, including marketing, finance, and management development. Whether the Investors were given board seats or merely assumed informal managerial positions within Vidible, their influence pervaded all aspects of Vidible's business, including its contract with SBG.

35. For example, one of the services Greycroft provides to its investees, such as Vidible, is "[d]etermining what not to do, in addition to prioritizing the most important opportunities." See http://greycroft.com/about/subpage/ (last visited on April 23, 2014).

36. When the Investors appreciated the significance of the parties' contract and the fact that it had not been reduced to writing, the Investors determined that Vidible ought not honor its contractual obligations, shifting SBG to the bottom of the company's priorities.

37. The Investors exerted pressure on Vidible by recommending, requiring, and demanding that Vidible eliminate SBG's contract and its 50% interest in the video player revenue stream in exchange for its investment in the company. In other words, SBG had outlived its utility now that Vidible had secured financing. Hyman, Vidible's other principal,

explicitly admitted to Battista that the Investors' influence was the reason why Vidible was trying to change the deal.

38. After several follow ups as to the status of SBG's overdue payments and Vidible's "proposal," Vidible responded with a ludicrous proposal, changing the entire oral contract as to all customers and not just Matomy, reducing the five year term to two, altering the percentage split, and capping monthly fees at $10,000 per customer.

39. Obviously, SBG was not receptive to Vidible's insulting overtures.

40. When it was clear that SBG would not renegotiate, Vidible attempted to end-run the contract by approaching both Matomy and DHI to merge the video player cost into an exchange deal to cut SBG out of the equation (since the parties never agreed to a specified commission on the video exchange).

41. In conjunction therewith, Mahlman and Hyman also began a smear campaign against SBG for the purpose of damaging its relationships with DHI, Matomy, among others. Vidible, Hyman, and Mahlman wrongly accused SBG and its consultants of participating in illegal and/or other improper activities.

42. For example, Mahlman flew to New York City to interfere in SBG's relationship with DHI and wrongly accuse SBG of receiving "kick-backs" on the advertising revenue and its consultant of receiving a "kick-back" arising out a pre-existing relationship with DHI. This was particularly misleading and calculated for maximum damage to the relationship since SBG was, in fact, entitled to a mark-up at the behest and knowledge of Vidible and DHI was, at all times, aware of the pre-existing relationship of SBG's consultant, OJ Paranone ("Paranone"). Paranone is the one who put DHI and SBG in contact in the first instance.

43. For example, Hyman flew to Israel to interfere in SBG's relationship with Matomy and to sow the same seeds of mistrust and feed them the same lies.

44. For example, Hyman contacted Paranone and urged him to breach his consulting agreement with SBG. Instead, he urged Paranone to join Vidible in generating business leads and maintaining existing SBG referred customers. Vidible followed up on Hyman's offer by then sending Paranone, directly, a services agreement, for his individual consideration, that cut out SBG.

45. Presently, Vidible is withholding SBG's share in the video player revenue stream and advertising dollars for campaigns run in 2013 and 2014.

46. SBG referred to Vidible other groups, including the Nikita Group Media, LLC, drugs.com, and AdMedia, who had done some testing and appeared to be viable customer relationships. To the extent that these or other SBG referred companies are generating a revenue stream from video player usage, SBG is entitled to its 50% share in the gross fees.

47. As of April 2014, SBG estimates that its earned and overdue payments on the video payer and advertising mark-up streams exceed $500,000.

## COUNT I
## BREACH OF CONTRACT
## (Plaintiff v. Vidible)

48. Plaintiff incorporates herein by reference the allegations set forth in the foregoing paragraphs above as though set forth at length herein.

49. In early 2012, SBG and Vidible entered into an oral contract whereby SBG agreed to procure customer relationships for Vidible and its products and, as to each customer so procured, Vidible agreed to pay SBG for its services.

50.  As to the video player revenue stream, the parties orally agreed to a 50/50 split of gross revenues generated by SBG for a five year term.  Vidible agreed to pay SBG when payment was received from the customer but in no event later than 45 days after receipt of payment.

51.  Vidible also agreed to provide a mark-up on Collective's advertising costs with DHI and Matomy.

52.  Vidible breached its duty to deliver the earned fees, among other things.

53.  Vidible breached its duty of good faith and fair dealing.

54.  SBG has performed all conditions precedent under the oral contract.

55.  Despite SBG's demand, Vidible has failed and/or refused to honor its obligations under the oral contract.

56.  As a result of Vidible's breach of the oral contract, SBG has suffered damages in an amount in excess of $5 million.

WHEREFORE, Plaintiff, Streamline Business Services, LLC, demands judgment in its favor and against Defendant, Vidible, Inc., in an amount in excess of $5 million, plus pre-judgment and post-judgment interest, costs of suit, and for such other relief as the Court deems equitable and just.

### COUNT II
### UNJUST ENRICHMENT
### (Plaintiff v. Vidible)

57.  Plaintiff incorporates herein by reference the allegations set forth in the foregoing paragraphs above as though set forth at length herein.

58.  In procuring customer relationships with DHI and Matomy for Vidible and its products, SBG conferred a substantial benefit upon Vidible in an amount in excess of $5 million.

59. In fact, SBG's contribution to Vidible at such a critical stage gives rise to a joint venture, entitling SBG to an equity ownership interest in the company.

60. Vidible accepted, retained, and enjoyed the benefit of SBG's procurement of customer relationships with DHI and Matomy for Vidible and its products.

61. The retention of the benefits of SBG's procurement of customer relationships with DHI and Matomy for Vidible and its products, without compensating SBG would be unjust.

62. The reasonable value of the benefit conferred by SBG is in excess of $5 million.

WHEREFORE, Plaintiff, Streamline Business Services, LLC, demands judgment in its favor and against Defendant, Vidible, Inc., in an amount in excess of $5 million, plus pre-judgment and post-judgment interest, costs of suit, and for such other relief as the Court deems equitable and just.

## COUNT III
## TORTIOUS INTERFERENCE WITH EXISTING AND PROSPECTIVE CONTRACTUAL RELATIONS
### (Plaintiff v. Greycroft and IDG)

63. Plaintiff incorporates herein by reference the allegations set forth in the foregoing paragraphs above as though set forth at length herein.

64. The acts and omissions of Greycroft and IDG constitute a tortious interference with SBG's business relationship with, among others, Vidible, DHI, Matomy, and Collective.

65. The Investors committed intentional acts, which include, among others, emailing and speaking with SBG's customers, reviewing Vidible's financials, contracts, and other business documents, including those related to SBG, exerting control over Vidible's managerial functions, determining what Vidible ought not do, and re-prioritizing Vidible's business obligations, for the purpose of wrongfully interfering with SBG's contract and business relationships.

66. This interference was done without justification and with one or more improper, illegal, and unacceptable motives, including maximizing investor profit at the expense of SBG and to the detriment of Vidible, whose contract and business relationship well pre-date both Greycroft's and IDG's investments in Vidible.

67. Greycroft's and IDG's tortious conduct has also interfered with SBG's prospective business relationships with others. For example, SBG had referred to Vidible other groups, including the Nikita Group Media, LLC, drugs.com, and AdMedia, who had done some testing and appeared to be viable customer relationships.

68. The acts of Greycroft and IDG were intentional, malicious, illegal, outrageous, and/or grossly reckless.

69. As a direct result of the interference, SBG has incurred damage including loss of profits, loss of business, loss of future profits, and costs, the extent of which is, to date, unknown.

70. SBG, as a Pennsylvania entity, felt the brunt of the harm caused by the Investors in Pennsylvania.

71. To the extent that Greycroft's and IDG's conduct was done knowingly, intentionally, willfully, wantonly, maliciously, and recklessly, SBG is entitled to an award of punitive damages.

WHEREFORE, Plaintiff, Streamline Business Services, LLC, demands judgment against Defendants, Greycroft Partners, L.P. and IDG Ventures USA III, L.P., jointly and severally, for damages in excess of $5 million, plus interest, costs of suit, and punitive damages for their intentional, willful, wanton and reckless conduct, and for such other relief as the Court deems equitable and just.

## COUNT IV
## TORTIOUS INTERFERENCE WITH EXISTING AND PROSPECTIVE CONTRACTUAL RELATIONS
### (Plaintiff v. Vidible, Hyman, and Mahlman)

72.  Plaintiff incorporates herein by reference the allegations set forth in the foregoing paragraphs above as though set forth at length herein.

73.  The acts and omissions of Vidible, Hyman, and Mahlman constitute a tortious interference with SBG's business relationship with, among others, Paranone, DHI, Matomy, Collective, the Nikita Group Media, LLC, drugs.com, and AdMedia.

74.  This interference was done without justification and with one or more improper, illegal, and unacceptable motives, including maximizing profit at the expense of SBG.

75.  Vidible's, Hyman's, and Mahlman's tortious conduct has also interfered with SBG's prospective business relationships with others. For example, SBG had referred to Vidible other groups, including the Nikita Group Media, LLC, drugs.com, and AdMedia, who had done some testing and appeared to be viable customer relationships.

76.  The acts of Vidible, Hyman, and Mahlman were intentional, malicious, illegal, outrageous, and/or grossly reckless.

77.  As a direct result of the interference, SBG has incurred damage including loss of profits, loss of business, loss of future profits, and costs, the extent of which is, to date, unknown.

78.  To the extent that Vidible's, Hyman's, and Mahlman's conduct was done knowingly, intentionally, willfully, wantonly, maliciously, and recklessly, SBG is entitled to an award of punitive damages.

WHEREFORE, Plaintiff, Streamline Business Services, LLC, demands judgment against Defendants, Vidible, Inc., Timothy Mahlman, and Michael Hyman, jointly and severally, for damages in excess of $5 million, plus interest, costs of suit, and punitive damages for their

intentional, willful, wanton and reckless conduct, and for such other relief as the Court deems equitable and just.

## Jury Trial Demand

Plaintiff hereby demands trial by jury of twelve (12) on all issues so triable.

                                                                Respectfully submitted by:

                                                                KUTAK ROCK LLP

By: _____
                                                               Oliver D. Griffin, Esquire
                                                               Melissa A. Bozeman, Esquire
                                                               Two Liberty Place, Suite 28 B
                                                               50 S. Sixteenth Street
                                                               Philadelphia, PA 19102
                                                               (215) 586-4586

                                                               Attorneys for Plaintiff

Dated: April 25, 2014

CERTIFICATE OF SERVICE

      I, Melissa A. Bozeman, do hereby certify this 25th day of April, 2014, that I have served and true and correct copy of the foregoing First Amended Complaint to all parties via first class mail as follows:

> Arthur W. Lefco, Esquire
> Gregory W. Fox, Esquire
> Marshall, Dennehey Warner Coleman & Goggin
> 2000 Market Street, Suite 2300
> Philadelphia, PA  19103
>
> and
>
> Gregory A. Blue, Esquire
> Dilworth Paxson, LLP
> 99 Park Avenue
> Suite 320
> New York, NY 10016

                                                                  _/s/ Melissa A. Bozeman_
                                                                  Melissa A. Bozeman